UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
PIKEVILLE

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| | ) | |
| Plaintiff, | ) | Criminal No. 09-25-ART |
| | ) | Civil No. 10-7138-ART |
| v. | ) | |
| | ) | **MEMORANDUM OPINION** |
| DONALD J. ADAMS, JR., | ) | **& ORDER** |
| | ) | |
| Defendant. | ) | |

\*\*\* \*\*\* \*\*\* \*\*\*

Donald Adams claims that, because his lawyer provided ineffective assistance, he did not knowingly and voluntarily plead guilty to conspiracy to distribute Oxycodone. He believes his sentence should be vacated under 28 U.S.C. § 2255. But he knew the stakes when he took an oath to tell the truth, went through an extensive colloquy, and pleaded guilty. Thus, the Court will neither relieve him from the consequences of his oath nor his decision to plead guilty.

### BACKGROUND

To most passersby, Donald Adams and Christopher Smith were minding their own business while sitting in a truck in a department store parking lot. But the complaint called into the Pikeville Police Department suggested that they were up to something illegal. Presentence Report ("PSR") ¶ 7. Upon arrival, the police approached the pair, who initially complied with police questioning. *Id*. After placing $17,466 on the hood of the police cruiser, Adams had second thoughts and attempted to flee on foot. *Id*. He did not get far. An officer captured Adams, but not before watching him discard 144 Oxycontin 80 mg. pills.

According to his co-defendant Smith, Adams had been traveling to Floyd and Pike

Counties from Michigan approximately two to three times per month over a period of eight or nine months. *Id*. at ¶ 10. Smith informed police that on each trip Adams brought roughly 500 Oxycontin tablets to distribute to local drug traffickers. *Id*. He also told police that Adams had already sold 300 pills on that particular trip. *Id*. at ¶ 9. At $60 a pill, that would account for the $17,466 initially found on Adams ($60 multiplied by 300 equals $18,000).

Adams pleaded guilty to conspiracy to distribute Oxycodone under 21 U.S.C. § 846 and a criminal forfeiture charge under 21 U.S.C. § 853. R. 52. In exchange for his guilty plea, the government agreed to dismiss Count 2 of the indictment—possession with intent distribute Oxycodone. The Court sentenced Adams to 109 months in prison. R. 71. Adams waived the right to appeal and collaterally attack his guilty plea, conviction, and sentence in his plea agreement. R. 50 at 3. As a result, the Sixth Circuit Court of Appeals dismissed his direct appeal. R. 92. Now, as part of his § 2255 motion, Adams argues that (1) his lawyer was ineffective in connection with his guilty plea and waiver, (2) he suffered a conflict of interest with his lawyer, (3) his lawyer was ineffective regarding the forfeiture of his vehicle, and (4) his lawyer was ineffective for not objecting to the government's breach of the plea agreement.

## DISCUSSION

Having received a sentence he did not like, Adams now wants to undo his guilty plea—this, despite his agreement not to collaterally attack his plea. Adams's problem is that he has very little evidence supporting his arguments that he was effectively coerced by his counsel to plead guilty.

Make no mistake: Adams swore in open court that his decision to plead guilty was his

2

own knowing and voluntary act. R. 56 at 15. No one, he said—neither the government's lawyers nor his own lawyer—made any assurances or promises outside of his signed plea agreement to induce a guilty plea. *Id*. Further, when told by the government that accepting the plea agreement would mean he waived the right to appeal and collaterally attack his guilty plea, conviction, and sentence, Adams indicated that the government had correctly summarized his plea agreement and persisted in his guilty plea. *Id*. at 14. He now claims this waiver was both unknowing and involuntary. R. 94.

In general, a criminal defendant may waive any right in a plea agreement, including constitutional rights and collateral-attack rights. *United States v. Fleming*, 239 F.3d 761, 763-64 (6th Cir. 2001); *Davila v. United States*, 258 F.3d 448, 451 (6th Cir. 2001). A waiver does not, however, preclude a defendant from challenging the validity of the waiver itself by arguing it was not knowing or voluntary or that it was the product of ineffective assistance of counsel. *In re Acosta*, 480 F.3d 421, 422 (6th Cir. 2007). And that is exactly how Adams attempts to proceed—by challenging the validity of the waiver itself. R. 94 at 5. But his claim is totally lacking in specifics. He instead relies on conclusory, unsupported allegations to prove his case. *Blackledge v. Allison*, 431 U.S. 63, 74 (1977) (noting that "conclusory allegations unsupported by specifics [are] subject to summary dismissal"). Because he fails to show his waiver was invalid, his § 2255 challenge is barred.

As an initial matter, Adams requests an evidentiary hearing to more fully develop the record. Section 2255(b) requires a reviewing court to hold such a hearing unless the motion and "the files and records of the case conclusively show that the prisoner is entitled to no relief."

3

Indeed, no hearing is required where the petitioner's allegations "are contradicted by the record, inherently incredible, or conclusions rather than statements of fact." *Arredondo v. United States*, 178 F.3d 778, 782 (6th Cir. 1999) (quoting *Engelen v. United States*, 68 F.3d 238, 240 (8th Cir. 1995)). Even though a § 2255 petitioner's burden "for establishing an entitlement to an evidentiary hearing is relatively light," *Smith v. United States*, 348 F.3d 545, 551 (6th Cir. 2003) (quoting *Turner v. United States*, 183 F.3d 474, 477 (6th Cir. 1999)), Adams has not met that burden here.

**1. Adams's plea was knowing and voluntary**.

Adams's statements during his Rule 11 plea colloquy present a "formidable barrier" to his current challenge. *Blackledge v. Allison*, 431 U.S. 63, 74 (1977). Placing Adams under oath, the Court asked him whether he had reviewed all counts in the indictment with his lawyer, as well as possible defenses. R. 56 at 3. He answered yes. The Court then asked: "Do you feel like you've discussed everything with your attorney you need to discuss in order to enter an informed and knowledgeable plea?" Again he replied, "Yes." *Id*. at 4. He stated that he was satisfied with his lawyer's advice and representation. *Id*. at 6. The Court then informed him of the rights he would give up by pleading guilty, including the right to trial by jury. *Id*. at 11-12. Further, he remained silent during the government's summary of his plea agreement—even when the government's attorney stated three different times that he was responsible for 1,500 Oxycodone tablets (something he now disputes). *Id*. at 13-14, 17. The government also explained that Adams waived his right to appeal and to collaterally attack his guilty plea, conviction, and sentence. *Id*. at 14. When expressly asked if the government accurately

4

summarized the agreement, Adams replied in the affirmative. *Id*. at 14. No, no one had promised or assured him of anything, including any of the lawyers, in order to induce him to plead guilty. *Id*. at 15. Yes, the decision to plead guilty was his own free and voluntary act. *Id*. And no, he had not been subjected to force or threats of any kind. *Id*. Concluding he was competent and capable of entering an informed plea, the Court accepted his plea of guilt. *Id*. at 18.

A defendant's "[s]olemn declarations in open court carry a strong presumption of verity." *Blackledge*, 431 U.S. at 74. And "where the court has scrupulously followed the required procedure, 'the defendant is bound by his statements in response to that court's inquiry.'" *Baker v. United States*, 781 F.2d 85, 90 (6th Cir. 1986) (quoting *Moore v. Estelle*, 526 F.2d 690, 696-97 (5th Cir. 1976)). Thus, later conclusory allegations contradicting those in-court statements and "unsupported by specifics [are] subject to summary dismissal." *Blackledge*, 431 U.S. at 74 (citing *Machibroda v. United States*, 368 U.S. 487, 495-96 (1962)). Adams's current efforts to cast doubt on his statements at his Rule 11 proceeding ring hollow.

First, Adams claims his lawyer failed to explain the terms in his plea agreement and did not allow him to read the agreement until thirty minutes before he entered the courtroom. R. 95 at 2. But even if true, the Court *explained* those terms to him, and he said he understood. R. 56 at 14; *see Reed v. United States*, No. 04-cr-139, 07-cv-59, 2008 WL 4963195, at *11 (E.D. Tenn. Nov. 17, 2008) ("Even if [his attorney] did not adequately explain the terms of the plea agreement, [the defendant] cannot demonstrate any prejudice because the Court carefully explained the terms of the plea agreement to him during the plea colloquy."). The Court also

fully explained the consequences of that plea, including the maximum penalty for his offense. R. 56 at 4, 7. Again, he stated that he understood. *Id*. And he assuredly did, probably better than most criminal defendants: During his plea colloquy, Adams informed the Court that he completed high school and then obtained a paralegal degree. R. 56 at 4. More importantly, he worked as a paralegal from 1992 to 2007. Adams's familiarity with the legal system only buttresses the conclusion his plea was valid. *See Davila*, 258 F.3d at 451-52 (noting that the defendant was a lawyer and not ignorant that he was waiving his appeal rights); *United States v. Wicks*, 995 F.2d 964, 978 (10th Cir. 1993) (looking at the totality of the circumstances in assessing the validity of a guilty plea and considering the defendant's education).

Undeterred by all this evidence that Adams knew what he was doing, he now argues that his lawyer "coached" his answers and "induced" his guilty plea.[1] R. 94 at 4-5. Yet he never explains exactly *how* his lawyer induced him to agree. He only says that "during the plea proceeding, [his lawyer] was coaching his answers, asked by Judge Thapar." *Id*. at 5. This claim is particularly incredible because it would have been noticed by both the Assistant United States Attorney (only a few feet away) and the Court (only a few yards away).

In the end, Adams's challenge to the validity of his plea and waiver is nothing more than a challenge to his sentence. He now admits responsibility for only 500 tablets—not 1,500 tablets as listed in his plea agreement. And he claims he told his lawyer as much before he entered his

---

[1] Since these allegations were ethical in nature, the Court asked Adams's attorney to submit an affidavit discussing his communications with Adams regarding the withdrawal of the first plea agreement. R. 101. Adams's attorney, however, appears to have retired and could not be reached through information on file with the Court. R. 102, 103. He is not one of the regular attorneys that appears in this Court (being from West Virginia), but rather is someone Adams retained.

guilty plea. R. 94 at 4. In response to this concern, Adams says his lawyer told him he would "take care of it." *Id*. at 5. Yet neither Adams nor his lawyer raised the issue during his rearraignment. What's more this evidence does not go to the knowing and voluntary nature of his waiver. It only shows that Adams disagreed with the quantity of tablets listed in his plea agreement. It says nothing about whether Adams understood the implications of his waiver.

This question over the quantity of Oxycodone appears to stem from Adams's reliance on an oral plea agreement offered by the government to Adams's original court-appointed attorney whom Adams replaced at some point with retained counsel. The government acknowledges that this preliminary offer included a smaller amount of Oxycodone, as well as a lesser-recommended sentence. R. 97 at 7. But, as often happens, the government withdrew that offer after the extent of Adams's involvement in the conspiracy became known. *Id*. And Adams cannot now use his § 2255 motion to revive that offer. Simply put, Adams offers no evidence that his plea and waiver were anything other than knowing and voluntary.

**2. Adams's waiver was not the product of ineffective assistance of counsel.**

Nor can Adams escape his plea agreement on the theory that his lawyer rendered ineffective assistance. To succeed on such a claim, he must show that his lawyer's services in connection with his plea fell below an objective standard of reasonableness and that he suffered prejudice—i.e., that he would have gone to trial but for his lawyer's deficient performance. *See Short v. United States*, 471 F.3d 686, 691 (6th Cir. 2006)*; Strickland v. Washington,* 466 U.S. 668, 687-94 (1984); *Hill v. Lockhart,* 474 U.S. 52, 59 (1985). But aside from alleging his lawyer "coached" his answers during the Rule 11 hearing (for which there is no proof), R. 95, he never

says that his lawyer misinformed or misled him about the waiver. Moreover, the real focus of his argument—the amount of drugs and resulting sentence—has nothing to do with the waiver. As a result, he is barred from bringing an ineffective-assistance-of-counsel claim. *Davila*, 258 F.3d at 451 ("When a defendant knowingly, intelligently, and voluntarily waives the right to collaterally attack his or her sentence, he or she is precluded from bring a claim of ineffective assistance of counsel based on 28 U.S.C. § 2255.").

Even assuming Adams could show his waiver was unenforceable, he still has not shown that his lawyer's performance fell below an objective standard of reasonableness with respect to his plea and waiver. To begin, Adams's counsel is presumed to have "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment," *Strickland*, 466 U.S. at 690, placing on Adams "a heavy burden of proof" to show otherwise, *Short*, 471 F.3d at 692 (quoting *Whiting v. Burt*, 395 F.3d 602, 617 (6th Cir. 2005)). This means he must show that, as part of the plea bargaining process, his lawyer "did not attempt to learn the facts of the case and failed to make a good-faith estimate of a likely sentence." *Id*. (quoting *United States v. Cieslowski*, 410 F.3d 353, 358 (7th Cir. 2005)). He must also show his lawyer's deficient performance was a "decisive factor in his decision to plead guilty." *Id*. (quoting *Cieslowski*, 410 F.3d at 358-59).

Should there be a question, Adams himself acknowledges that his lawyer "fully read[], review[ed] and investigat[ed] the facts of his case." R. 94 at 4. Only afterward did he allegedly "induce" Adams to plead guilty. *Id*. His basis for this claim appears to be that his lawyer failed to follow up on his assertions that he was responsible for a lesser amount of Oxycodone, thereby

8

entitling him to a lesser sentence as initially offered by the government. But the government withdrew that offer and replaced it with the agreement Adams eventually signed. And there was nothing preventing it from doing so: Plea agreements are simply contracts that can be offered and withdrawn. *United States v. Socolovitch*, 340 F. App'x 291, 296 (6th Cir. 2009) (citing *United States v. Lukse*, 286 F.3d 906, 909 (6th Cir. 2002)). Further, Adams admits he knew that the second agreement differed from the initial offer. R. 95 at 2 (stating that while speaking with his attorney before entering his plea he "noticed that it stipulated 1500 Oxycodone tablets"). And yet he walked into open court and affirmed its accuracy. Nor did he move to correct the plea agreement before sentencing.

Moreover, even though Adams appears to have had differences with his lawyer before his sentencing, he specifically instructed his lawyer to say nothing about withdrawing from representation until *after* his sentencing. R. 75 at 31 ("I would have addressed this before we started, but [Adams] told me to do my job and then talk to you afterward about it."). According to his lawyer, Adams also threatened to have his license taken away for not securing a lesser sentence and saving his vehicle from forfeiture. *Id*. Adams nevertheless remained silent until *after* the Court handed down his sentence. At the conclusion of his sentencing hearing when Adams's lawyer moved to withdraw as counsel of record, Adams addressed the Court, not about his lawyer's performance, but about the extent of his involvement in the conspiracy. He stated: "I don't think that was fair, Your Honor, all that time. It wasn't me. You know, and the amount they said, there was nowhere near that amount that was coming in here. I don't think that was fair at all." R. 88 at 32. In response, the Court informed Adams that if he was not responsible

9

for the pills, he probably should not have pleaded guilty. *Id*. Adams, nevertheless, did not ask to withdraw his plea at that time or any other time or claim he was "coached" or "induced" into pleading guilty.

While not relevant to the guilty plea, Adams lobs another tomato at his attorney—he claims that his retained attorney did not share the presentence report with him. R. 95 at 3. Again, the record contradicts this assertion. First, his attorney noted on the record that he reviewed the PSR with Adams, and Adams did not contradict him. R. 88 at 2. Second, his lawyer actually withdrew an objection stating that he was withdrawing it after "reading the response and speaking with my client." *Id*. at 14. Adams remained silent. Although what happened at the sentencing hearing is not relevant to his assertions regarding the guilty plea, they do go to his credibility. The record simply belies his assertions.

In the end, the waiver provision contained in Adams's plea agreement is enforceable. Further, Adams received a benefit by pleading guilty: The government agreed to dismiss Count Two of the indictment—possession with intent to distribute Oxycodone—and recommended he receive credit for acceptance of responsibility, including the three-level reduction. *United States v. Coleman*, 627 F.3d 205, 215 (6th Cir. 2010) (stating that it is within the government's discretion to move for three-level reduction so long as the "reason for refusal is not based upon a constitutionally impermissible factor and is not arbitrary"). As much as he might wish otherwise, this is not a case where an attorney failed to convey a plea offer to the defendant. *Griffin v. United States*, 330 F.3d 733, 737 (6th Cir. 2003). Nor is it a case where the defendant alleges his guilty plea was the result of coercive police tactics or mental illness. *See Fontaine*

*v. United States*, 411 U.S. 213, 214 (1973). This is a case where a defendant seeks to resurrect an offer made by the government before all the facts of his case came to light. But that offer was withdrawn, and Adams knowingly and voluntarily entered a plea of guilty. Through his § 2255 motion, he in effect asks the Court to believe he lied during his Rule 11 hearing. *United States v. Bowman*, 348 F.3d 408, 417 (4th Cir. 2003) ("[W]hen a defendant says he lied at the Rule 11 colloquy, he bears a heavy burden in seeking to nullify the process."). There is simply no support for his request.

### 3. Conflict of Interest

Adams next argues his waiver was invalid based on a conflict of interest with his lawyer. He claims this conflict arose from his lawyer's "empathy of assisting the government." R. 94 at 8. If a conflict in fact existed, this might support Adams's contention that his plea was somehow invalid. But this claim has no basis in fact.

To succeed on this claim, Adams must show: "(1) that there was an actual conflict of interest; and (2) that the conflict adversely affected the voluntary nature of the guilty plea entered by the defendant." *Thomas v. Foltz*, 818 F.2d 476, 480 (6th Cir. 1987) (internal citation omitted). To demonstrate an "actual" conflict of interest, a party "must make a factual showing of inconsistent interests and must demonstrate that the attorney 'made a choice between possible alternative courses of action, such as eliciting (or failing to elicit) evidence helpful to one client but harmful to the other.'" *Id*. at 481 (quoting *United States v. Mers*, 701 F.2d 1321, 1328 (11th Cir.)). Here, there is no evidence of "inconsistent interests." Rather, Adams repeats his allegation that his attorney failed to object to the quantity of Oxycodone in his plea agreement.

11

R. 94 at 7. But that allegation does not demonstrate a conflict of interest. He also suggests the conflict resulted from his lawyer's efforts to aid the government rather than his own client by not requesting a downward departure for his acceptance of responsibility at sentencing. *Id*. at 7-8; R. 56 at 14 ("At this time the United States agrees Mr. Adams is entitled to a two-level reduction for acceptance of responsibility. And we intend to move for an additional one level at time of sentencing."). But there was no need to address this issue at sentencing: Adams's presentence report indicates he received a three-level reduction for acceptance of responsibility. PSR at ¶ 22.

He offers nothing else to support finding a conflict of interest. Thus, Adams has not shown that a conflict of interest existed with his lawyer such that the validity of his plea is called into doubt.

### 4. Forfeiture

Adams next claims his lawyer denied him effective assistance of counsel when he failed to object to the forfeiture of Adams's 2003 Chevrolet Suburban; he now seeks the return of this vehicle. R. 94 at 10. But because he agreed to this forfeiture in his plea agreement and knowingly and voluntarily waived the right to such a collateral attack, he is precluded from raising this issue. Moreover, a § 2255 motion is an inappropriate vehicle for seeking the return of forfeited property. *Anders v. United States*, No. 97-6397, 1998 WL 537568, at *1 (6th Cir. Aug. 7, 1998) (stating that "a § 2255 action is not the appropriate vehicle for challenging a civil forfeiture" and commenting that "even if it were assumed that the forfeiture was analogous to

a criminal fine, [] the imposition of a fine is not a sufficient restraint on liberty to meet the custody requirement of § 2255").

Even if he could bring this challenge, it would be without merit. Property is subject to forfeiture under 21 U.S.C. § 853(a)(2) if the government can show that the vehicle was used to commit or facilitate the violation. That Adams purchased and paid for the vehicle prior to committing the current violation is of no consequence. Rather, forfeiture is justified when it has been shown the automobile was used as transportation to and from the drug transactions for which the defendant is convicted. *United States v. One 1984 Cadillac*, 888 F.2d 1133, 1137 (6th Cir. 1989) (holding that use of vehicle for transportation to site of an illegal transaction was sufficient to demonstrate probable cause for forfeiture of the vehicle); *United States v. White*, No. 07-29, 2007 WL 3244054, at *3 (W.D. Mich. Nov. 1, 2007) (citing *United States v. Lewis*, 987 F.2d 1349, 1356-57 (8th Cir. 1993)). Adams does not deny that the vehicle was used in this way—he only claims he purchased it before the violation occurred. R. 94 at 11.

Moreover, Adams's reliance on § 853(d) is misplaced. He maintains the government could not prove by a preponderance of the evidence that his property was acquired by him during the period of the charged conspiracy or within a reasonable time thereafter. R. 94 at 10. Nor, he claims, can the government prove there was "no likely source for such property other than the violation." *Id*. But § 853(d) pertains to the issue of forfeiture at trial, and again, Adams opted against proceeding to trial. He resolved any doubt about the connection between the vehicle and the transaction when he pleaded guilty to that count in the indictment. R. 56 at 18. And he does

not allege that he was unaware of this provision in his plea agreement or that his lawyer misled him in any way.

## 5. Breach of the Plea Agreement

Finally, Adams argues he received ineffective assistance because his attorney failed to object to the government's breach of the plea agreement. R. 94 at 12. Like his previous arguments, it, too, is easily dismissed.

At sentencing, the government sought a leadership enhancement for Adams's role in the offense under U.S.S.G. § 3B1.1(c). In Adams's view, this action constituted a breach of the plea agreement, and his attorney should have objected. *Id*. True, Adams's original plea agreement included a provision allowing the government to seek a leadership enhancement for his role in the conspiracy. R. 50 at 3. And yes, a line was drawn through that provision and initialed by the Assistant United States Attorney and Adams himself. *Id*. Nothing, however, indicates that by crossing out that provision the government agreed *not* to seek an enhancement. Rather, as explained by the government at Adams's rearraignment, the line through the provision only meant that Adams preserved his right to contest the enhancement at sentencing. R. 56 at 13-14.

That is exactly what his lawyer did. During Adams's sentencing hearing, the Court and his lawyer engaged in a lengthy discussion of Adams's objection to the leadership enhancement. R. 88 at 2-13. The Court overruled it but not before considering his argument. *Id*. at 13. There was simply no breach of the agreement.

**6. Certificate of Appealability**

A certificate of appealability may issue where a petitioner has made a "substantial showing of the denial of a constitutional right ." 28 U.S.C. § 2253(c)(2). Adams has not made that showing here, nor has he shown that "reasonable jurists would find [this C]ourt's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). As a result, no certificate of appealability shall issue.

Accordingly, it is **ORDERED** that:

(1) Adams's motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255, R. 94, is **DENIED**.

(2) A Certificate of Appealability **WILL NOT ISSUE** because Adams has not made a substantial showing of the denial of any substantive constitutional right.

(3) This matter is **DISMISSED WITH PREJUDICE** and **STRICKEN** from the Court's active docket.

This the 25th day of May, 2011.



Signed By:
*Amul R. Thapar*
United States District Judge